# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary Doucette,

                    Plaintiff,

                                            **MEMORANDUM OPINION**
          v.                                **AND ORDER**
                                            Civil No. 12-cv-00373 ADM/LIB
Morrison County, Minnesota,

                    Defendant.

---

Clayton D. Halunen, Esq., Susan M. Coler, Esq., Michelle Dye Neumann, Esq., Jacob Frey, Esq., and Brian T. Rochel, Esq., Halunen & Associates, Minneapolis, MN, on behalf of Plaintiff.

Dyan J. Ebert, Esq., and Melinda M. Sanders, Esq., Quinlivan & Hughes, PA, St. Cloud, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On April 10, 2013, the undersigned United States District Judge heard oral argument on Defendant Morrison County's (the "County") Motion for Summary Judgment [Docket No. 15]. In her Complaint [Docket No. 1-1], Plaintiff Mary Doucette, a former County employee, alleges the County discriminated against her in violation of the Family Medical Leave Act (FMLA) and the Minnesota Human Rights Act (MHRA). For the reasons stated herein, the County's motion is granted in part and denied in part.

## II. BACKGROUND

Doucette began working as the assistant jail administrator for the Morrison County sheriff's department in 1994.[1] Part 1 of Doucette Decl. [Docket No. 28] ("Doucette Decl. I") ¶ 4.

---

[1] The parties appropriately designated certain portions of the record in this case as confidential in accordance with the Court's Protective Order [Docket No. 10] and subsequent discovery Order [Docket No. 11]. However, the parties, and Doucette in particular, appear to have filed large portions of the record under seal without clear justification. As a result, the

The sheriff's department is structured into two divisions: the jail division and a general division. The general division encompasses multiple functions, including patrol, clerical, and investigative duties. Attach. to Coler Decl. [Docket No. 27], Wetzel Dep. 9-11, 73 (filed under seal). Id. The hierarchy within these two divisions is not parallel.

In the jail division, the jail administrator oversees various staff, including the assistant jail administrator, in the operation of the County's jail. See id. The assistant jail administrator has several areas of responsibility. First, she functionally serves as the jail administrator in the jail administrator's absence. Sanders Aff. [Docket No. 18], Ex. C (assistant jail administrator job description). This requires the assistant jail administrator to oversee staff, ensure the proper operation of the jail facility, conduct inspections, and also assist in budgeting and other reporting duties. Id. She also performs human resources functions, including conducting training, evaluations, and recruitment. Id. Third, the assistant jail administrator handles record-keeping, which includes managing inmate files, medical reports and various other logs, and also billing other counties for housing prisoners. Id. In addition to these responsibilities, the assistant jail administrator supervises inmate programming and services, and performs whatever other duties the sheriff directs. Id.

As assistant jail administrator, Doucette, a sergeant, initially reported to jail administrator Lieutenant Don Boone. Boone, in turn, reported to Sheriff Paul Tschida. Doucette Decl. I ¶ 4.

---

Court's ability to cite publicly-available documents is somewhat curtailed. Where the information at issue is clearly non-confidential, the Court has cited the record.

In addition, Doucette filed a two-part declaration, the second part of which she filed under seal, that revisits and rebuts areas of her deposition testimony. To the extent this declaration contradicts Doucette's deposition testimony, the Court does not consider it. See, e.g., Popoalii v. Corr. Med. Servs., 512 F.3d 488, 498 (8th Cir. 2008).

Sheriff Michel Wetzel was elected in November 2002 and replaced Tschida in 2003. In 2004, Wetzel sought a replacement for Boone as jail administrator. Doucette applied for the position, but Wetzel hired Michael Monnier, a correctional officer then promoted to lieutenant. Doucette Decl. I ¶¶ 4, 13.

Doucette handled her job responsibilities as assistant jail administrator for several years, having only minor performance issues relating to staff supervision and communication. Attach. Coler Decl., Monnier Dep. 13-15; Doucette Decl. I ¶ 16. Then, on January 22, 2007, Doucette received a verbal reprimand from Monnier. In his memorandum discussing the reprimand, Monnier wrote that he had "numerous discussions" with Doucette regarding the importance of forwarding bills to the Auditor's Office in a timely manner, and the importance of ensuring the bills' accuracy. Sanders Aff. Ex. D. In explaining the reprimand, Monnier noted that Doucette had submitted a bill for payment that had been sent in error by a vendor, and did not actually require payment. Id. He issued the reprimand because in addition to the inaccurate bill, Doucette had failed to submit a "large stack" of invoices to the auditor's office before the end of 2006, meaning the reflected expenses would be counted as expenses for 2007. Id.

In her deposition, Doucette explained that overbilling errors sometimes occur because of miscommunication between herself and the other staff, who coordinate the actual receipt of the items described in the invoices. Attach. to Coler Decl., Doucette Dep. 36-37 (filed under seal). Nevertheless, Doucette admitted the verification of invoices was ultimately her responsibility. Id. at 37-38, 61, 69-70. In response to the late-filed invoices, Doucette explained at least some of the late bills had not reached her desk until after the end of the year, and that in general, she had been overwhelmed with work in 2007. See id. at 27-29.

On March 20, 2007, Monnier issued a second verbal reprimand to Doucette relating to her billing other counties for their use of Morrison County's extra jail capacity to house inmates. Sanders Aff. Ex. E. In March 2007, someone from the St. Louis County jail notified Monnier that the County had issued a housing invoice for February 2 through February 28, 2007, but had omitted February 1. Id. Monnier estimated that the omission of this single day could cost the County $2,400, and instructed Doucette to call other counties receiving invoices to note the error. Id.

After these two verbal reprimands, Doucette's employment continued without a documented incident for over two years. On October 13, 2009, Monnier completed a performance appraisal for Doucette. Sanders Aff. Ex. F. Monnier asked Doucette to rank herself from 1-4 in several categories, with "1" meaning "unacceptable" and "4" meaning "exceeds performance expectations." Id. Doucette ranked herself as a "4" in 10 out of 11 categories, but Monnier reduced seven of these rankings to a "3," which meant "meets performance expectations." Id.; Doucette Dep. 42-43. Monnier noted Doucette was "very knowledgeable with the jail's computer and electronics equipment," that she was "very helpful when filling in for staff," and that she had improved with regard to billing errors in the previous 12 months. Sanders Aff. Ex. F. Monnier also noted Doucette's rapport with other staff "had been more positive," as they had discussed "not openly talking about mistakes made by other employees when staff are present." Id.

On November 10, 2010, Monnier issued a letter of reprimand to Doucette. In the letter, Monnier included several items as background. He noted a September 2010 discussion he had with Doucette regarding an August inmate medication billing error, in which the County was

overcharged for medication.  At that time, Monnier advised Doucette to "double check all billings for accuracy."  Sanders Aff. Ex. G.  Also in September 2010, Monnier received an invoice from Wal-Mart for medication, but the County had discontinued purchases from Wal-Mart two months prior.  Id.  Upon further investigation, it appeared the County may have been over-billed for medications dating back as far as December 2008.  Id.  Then, in October 2010, Doucette overcharged Douglas County by $1,500 for the housing of an inmate who was not actually in the jail.  Monnier discussed with Doucette the importance of accuracy in billing, as errors could affect the County's relationship with other departments.  Id.  Doucette now admits these errors, but argues the issues were ultimately corrected and not the sort of errors that might affect the County's business relationships.

The November 10, 2010, letter of reprimand resulted in the County placing Doucette on a corrective action plan.  Sanders Aff. Ex. H.  The plan primarily required Doucette to verify all billings and create a log tracking these verifications.  It also required Doucette to create monthly billing statements, the approval of which was necessary before Doucette could send out invoices.  Id.  The plan stayed in effect for 6 months, and ended in May 2011.  At that time, Monnier wrote that Doucette "acknowledged that she had made errors in the past" but that going forward, "things should be fine."  Sanders Aff. Ex. I.

Doucette was on vacation from the end of January 2011 through the end of February 2011.  Doucette Dep. 86.  Earlier, in September 2010, an auditor with the Office of the State Auditor had recommended the sheriff's department conduct monthly reconciliations of the inmates' commissary accounts (known as "PX accounts"), a matter within Doucette's assigned responsibilities.  Sanders Aff. Ex. L.  Several months after Doucette returned from vacation, in

May 2011, Monnier asked about the status of the reconciliations. Doucette misrepresented to Monnier that she had completed the reconciliations. Doucette Dep. 100. Doucette testified that she had done so to "get him off [her] back" while she worked on accounting errors in the computer system. Id.

In June 2011, Monnier met with Doucette regarding the reconciliations. Sanders Aff. Exs. K, L. At the meeting, Doucette told Monnier about the accounting errors for the first time. Monnier and Doucette then met with Sheriff Wetzel, where Doucette informed them only three reconciliations had been completed since September 2010. Monnier also noted a $20 discrepancy in one reconciliation sent to the State Auditor's Office. It appeared to Monnier that Doucette used "white-out" to later alter the inmate checkbook register and retroactively correct the error. Sanders Aff. Ex. L. Id. Finally, Monnier and Wetzel also discussed an additional discrepancy in the County's billing from Coburn Pharmacy for inmate medication. Id. Doucette informed them she was working with the pharmacy to correct the invoice. Id. Given Doucette's disciplinary history, Monnier placed Doucette on a 3-day suspension.

At her deposition, Doucette seemingly disputed this version of events, testifying in a vague manner that she had submitted six months of "bank statements" but that Monnier had failed to approve them. See Doucette Dep. 115. However, as Monnier testified, retrieving inmate account statements was only the first step in performing the reconciliations. Monnier Dep. 59-60, 77-80. In her memorandum, Doucette no longer disputes that she failed to conduct the reconciliations, and instead argues the computer system delayed her. See Pl.'s Mem. Opp. Summ. J. [Docket No. 34] ("Pl.'s Opp.") 20 (filed under seal). Doucette also notes Monnier directed another employee to refrain from conducting the February 2011 reconciliation during

Doucette's vacation, as Monnier preferred Doucette handle the task. See Monnier Dep. 54-55. Also, Doucette conceded that she had used "white-out" to redact several register entries, but also suggested that she had done so in order to double-check her work. See Doucette Dep. 116-18. Doucette had no recollection of the Coburn Pharmacy billing error. Id. at 120-21.

In July 2011, Monnier again met with Doucette. Monnier discovered a bill forwarded to him by Doucette for payment of inmate medical services for which the County was not responsible. Sanders Aff. Ex. M. Monnier also noted an error in which Doucette had addressed a bill intended for St. Louis County to another county instead. On this occasion, Monnier placed Doucette on a 5-day suspension, and warned her that he would be closely monitoring her work, particularly with regard to billing. Id. Doucette admits the errors, but argues she would have caught and corrected them. Pl.'s Opp. 21.

On August 11, 2011, Doucette went on FMLA leave. Just before doing so, she filed a union grievance regarding her suspension. On August 25, 2011, Wetzel met with Doucette and Merl King, her union representative. In a letter following the meeting, Wetzel wrote Doucette admitted making the errors at issue. Sanders Aff. Ex. O. Wetzel noted Doucette faced issues in her personal life that might have led to her work difficulties. Ultimately, Wetzel concluded these personal issues could not excuse her performance and that the escalating disciplinary actions and suspension were warranted. In the letter, Wetzel also noted he had previously advised Doucette to make use of the Employee Assistance Program for her personal problems and to consider taking leave under the FMLA.

Also while on her FMLA leave, Doucette submitted a complaint to the County alleging age and sex discrimination. Sanders Aff. Ex. Q. County Administrator Deb Gruber began an

investigation into the allegations.  Gruber attempted to contact Doucette several times for further information, but Doucette did not cooperate with these requests.  <u>See</u> Attach. to Coler Aff., Gruber Dep. at 68-72 (filed under seal).

On September 16, 2011, Doucette met with Gruber and the County Attorney and informed them she had retained counsel, who would handle the matter.  <u>Id.</u>  Doucette's counsel wanted to put the investigation on hold, but Gruber disagreed and continued her inquiry.  <u>Id.</u> at 71.  Shortly thereafter, Gruber closed the investigation.  <u>Id.</u>  Gruber also upheld Doucette's 5-day suspension as warranted under the circumstances.  Sanders Aff. Ex. S.

In addition to handling Doucette's complaint and grievance, Gruber contacted Doucette's clinic regarding her FMLA leave.  On Doucette's FMLA certification, the clinic had improperly stated a cause for Doucette's absence.  Gruber spoke with a nurse at the clinic and then a hospital administrator, and eventually had the certification reissued without a stated cause.  <u>See</u> Gruber Dep. 23-32.  At oral argument, the parties agreed that to their knowledge, neither Monnier nor Wetzel had directed Gruber to take this action.

Doucette returned from her approximately three months of FMLA leave on October 24, 2011.  Before she resumed work, Doucette met with Monnier.  Monnier suggested Doucette focus on implementing "Lexipol," a new jail policy, and allow others to assume some of Doucette's other responsibilities.  Monnier Dep. 209-11.  From the time of her return, however, Doucette argues the County scrutinized her actions and issued confusing directives.

On November 7, 2011, Doucette submitted copies of invoices for inmate medication to Monnier.  On one invoice, Monnier noticed Doucette had "double-billed" a prescription, resulting in an overcharge to the County of about $15 to $20.  <u>Id.</u> at 18-20, 31.  On another

invoice, Doucette failed to include a copy of the inmate's "white ticket," a small piece of paper indicating the inmate's prescription and confirming its proper delivery to the jail. Id. at 18-22. Doucette explained, and Monnier did not dispute, that Doucette had omitted the white ticket due to a copying error. Upon being told of the omission, she retrieved the original white ticket and provided it to Monnier. See id. at 22-24.

On or about November 14, 2011, Wetzel sent Doucette a Notice of Intent to Terminate. Sanders Aff. Ex. X. In the notice, Wetzel noted Doucette admitted to the two November billing errors. He wrote that while these mistakes would not warrant termination as a "first offense," in this case they were the final straw in Doucette's "recurring performance problem" in submitting accurate bill payments. Id. Wetzel summarized Doucette's history of disciplinary actions, and concluded further support or coaching would not improve her performance. Id. Doucette's union agent contested the termination, but Wetzel upheld his original decision. Doucette's termination took effect on November 21, 2011. Sanders Aff. Ex. Y.

On or about January 17, 2012, Doucette initiated this action, which the County removed to federal court. Not. of Removal [Docket No. 1] 2. Through her briefing and at oral argument, Doucette has since ceded some of her claims. In the present motion, Doucette argues for the viability of the following claims: (1) retaliation in violation of the FMLA; (2) reprisal in violation of the MHRA; (3) sex discrimination in violation of the MHRA; and (4) sex-plus-age discrimination in violation of the MHRA. Although the Complaint does not explicitly discuss a sex-plus-age discrimination, Doucette argues her allegations sufficiently plead the requisite elements to state a claim.

# III. DISCUSSION

## A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995). A plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

The United States Supreme Court and the Eighth Circuit Court of Appeals have held that district courts should not "treat discrimination differently from other ultimate questions of fact." <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1043 (8th Cir. 2011) (citations omitted). There is no "discrimination case exception" to the standard for summary judgment, and courts should not treat plaintiffs alleging discrimination with particular deference. <u>See</u> <u>id.</u>

**B. Retaliation under FMLA**

Congress enacted the FMLA to, in part, "entitle employees to take reasonable leave for medical reasons. . . ." 29 U.S.C. § 2601(b)(2). An "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period " for reasons including a serious health condition. Id. § 2612(a)(1)(D). If an employee requests leave under the FMLA, the employer may require the employee to obtain a certification issued by the employee's health care provider. Among other things, the certification must document the date the condition commenced, its probable duration, the "appropriate medical facts" about the condition, and a statement that the employee is "unable to perform the functions of [his or her] position." Id. § 2613(b). To protect employees, the FMLA prohibits employers from interfering with the exercise of FMLA rights, and it also prohibits employers from terminating or otherwise discriminating against an employee choosing to exercise these rights. Id. § 2615.

A plaintiff may circumstantially demonstrate FMLA retaliation by employing a modified version of the McDonnell Douglas burden-shifting test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). The test involves three steps. First, the plaintiff must establish a prima facie case of retaliation. To do so, the plaintiff must show that she exercised her rights under the FMLA; that she suffered an adverse employment action; and that there was a causal connection between her exercise of rights and the adverse action. McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002-03 (8th Cir. 2005). If the plaintiff establishes these elements, the burden shifts to the defendant to state a legitimate reason for the adverse employment action. See Hill v. St. Louis Univ., 123 F.3d 1114, 1119 (8th Cir. 1997). If a legitimate reason is proffered, the burden then shifts back to the plaintiff to show that the stated

reason was pretext for retaliatory motive.  Id.

Doucette claims the County terminated her, at least in part, because of her decision to take FMLA leave.  The parties do not dispute the first two elements of Doucette's prima facie case.  To rebut the alleged pretext of her performance issues, the third element, Doucette notes the County terminated her just weeks after she returned from FMLA leave.  She argues the temporal proximity between these two events necessarily implies a causal connection.  It is true courts have sometimes found a causal connection when the timing between the protected activity and adverse action is extremely close.  See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832-33 (8th Cir. 2002).  But the Eighth Circuit Court of Appeals has held that when temporal proximity is the only evidence of causation, the resulting prima facie case will be weak at best.  See id. at 832-34.

Doucette has not established a prima facie case of FMLA retaliation.  Doucette mistakenly focuses on her return from FMLA leave, and not her initial exercise of FMLA rights, as the starting point for her causation analysis.  The Eighth Circuit has unequivocally held that the relevant date for an FMLA retaliation claim is of the plaintiff's "use (or planned use) of FMLA leave, not the date it ended."  Sisk v. Picture People, Inc., 669 F.3d 896, 900 (8th Cir. 2012) (citing Smith, 302 F.3d at 833).  In Sisk, the court held a period of two months between the plaintiff's first leave of absence and her ultimate termination was "too long to support a finding of causation without something more."  Sisk, 669 F.3d at 901.  Here, Doucette went on leave on August 11, 2011, making it the latest possible date relevant to causation.  The County terminated Doucette three months later, on November 11, 2011.  By itself, a period of three months between the exercise of a protected right and termination is insufficient to establish

causation.

In an attempt to offer "something more" to establish causation, Doucette cites her arguments in support of her MHRA retaliation claim. Doucette's arguments in support of MHRA retaliation have no obvious or implicit connection to her claim for FMLA retaliation. An FMLA retaliation claim focuses solely on an employer's attempt to punish or discriminate against an employee for taking appropriate leave or seeking other accommodations. Retaliating against Doucette for voicing a complaint of age and sex discrimination is an entirely separate issue.

As a second attempt to add "something more," Doucette cites County Administrator Gruber's efforts to remove her stated reason for FMLA leave from her medical certification. Gruber's communications with Doucette's healthcare provider, while somewhat questionable, might be better directed toward an FMLA interference claim. Not only has Doucette failed to previously allege such a claim, Gruber's efforts did not actually deny or curtail Doucette's leave of absence, meaning no actual interference occurred. See Stallings v. Hussmann Corp., 447 F.3d 1041, 1050-51 (8th Cir. 2006). Furthermore, Wetzel's August 29 letter indicates, and Doucette does not dispute, that the County first suggested Doucette look to employee assistance programs and FMLA leave as potential options. See Sanders Aff. Ex. O. This is a contradiction of a retaliatory animus, and further defeats Doucette's efforts to establish a prima facie case of FMLA retaliation.

## C. MHRA Claims

Doucette alleges three claims against the County under the MHRA (also referred to herein as the "Act"), for prohibited sex discrimination, sex-plus-age discrimination, and reprisal.

See Minn. Stat. § 363A.01, et seq.  The MHRA, in part, prohibits employers from discharging an employee because of his or her membership in any of several protected classes, including age and sex.  Id. § 363A.08, subd. 2.  The Act also prohibits any employer who engaged in the alleged discrimination from intentionally engaging in any reprisal against a person because he or she contested that discriminatory behavior.  See id. § 363A.15.

When an MHRA plaintiff does not introduce direct evidence of discriminatory motive, the court proceeds with the McDonnell Douglas burden-shifting test outlined above.  See Hervey v. Cnty. of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008) (applying McDonnell Douglas test to MHRA sex discrimination claim); Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 548 (Minn. 2001) (applying test to MHRA reprisal claim).  In terms of evidence, the burden of production shifts from plaintiff to defendant and back through the stages of the McDonnell Douglas test.  Nevertheless, the plaintiff has the burden of persuasion throughout, "to show that the adverse employment action was motivated by intentional discrimination."  Kennedy v. GN Danavox, 928 F. Supp. 866, 872 (D. Minn. 1996) (citation omitted).

**1.  Sex Discrimination**

Doucette alleges the County discriminated against her on the basis of her sex by disproportionately reprimanding her as compared to her male colleagues and ultimately terminating her employment as the culmination of her reprimands.

**a.  Prima facie case**

To establish a prima facie case of sex discrimination, the plaintiff must show: "(1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of

discrimination." Elam v. Regions Fin. Corp., 601 F.3d 873, 879 (8th Cir. 2010) (quotation

omitted). Here, there is no meaningful dispute regarding the first three elements of a prima facie

case.

To establish the fourth factor, an inference of discrimination, the plaintiff may

demonstrate she experienced disparate treatment as compared to similarly-situated members

outside of the protected class. Harnan v. Univ. of St. Thomas, 776 F. Supp. 2d 938, 944-45 (D.

Minn. 2011); see also Hervey, 527 F.3d at 719-21. The test for identifying other employees as

similarly-situated is a "rigorous" one. Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir.

2004) (quotation omitted). "Specifically, the individuals used for comparison must have dealt

with the same supervisor, have been subject to the same standards, and engaged in the same

conduct without any mitigating or distinguishing circumstances." Id. (quotation omitted). If

discrepancies in the handling of misconduct is at issue, the misconduct of the other employees

must be of comparable severity and frequency. Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir.

2003); E.E.O.C. v. Kohler Co., 335 F.3d 766, 776 (8th Cir. 2003) (misconduct must be of

"comparable seriousness") (citations omitted).

Doucette's memorandum combined with the second part of her declaration, both filed

under seal, identify six male employees Doucette argues received more favorable disciplinary

treatment than she did.[2] As an initial matter, Doucette does not indicate, let alone establish, that

these employees are similarly-situated. None of the six had similar job responsibilities. See

Monnier Dep. 92-93, 103-05. Doucette herself testified that her position was unique, and that no

---

[2] The parties have designated information about the individuals subjected to discipline or asked to resign by the County as confidential. No reference to specific names or identifying information will be made here, but some basic factual discussion is still required.

one had the same responsibilities. Doucette Dep. 185. Also, at least one of the six male employees Doucette identifies worked in law enforcement, outside of the jail division altogether, while others are or were correctional officers or jail programmers. See Part 2 of Doucette Decl. [Docket No. 29] ("Doucette Decl. II") (filed under seal) ¶ 32. Doucette's rank was also higher than the identified employees. As assistant jail administrator, Doucette testified that "pretty much" the entire jail staff worked under her and Monnier. See Doucette Dep. 46-48. Doucette had a higher pay grade than anyone other than Monnier in the jail division, and she occasionally handled the discipline of jail division employees. Id. at 175, 215-16. As an assistant administrator, Doucette has not demonstrated how the male employees she identifies are similarly-situated, given these employees' differing positions, supervisors, and responsibilities.

Consequently, Doucette cannot identify similar instances of misconduct for which the County disciplined her but not others. Instead, she describes circumstances in which male employees allegedly mishandled inmate security, or failed to keep regular work hours. See generally Doucette Decl. II. If true, this behavior may indeed amount to misconduct, but these instances do not lend themselves to easy comparison with Doucette's record-keeping and billing errors. See Cherry, 361 F.3d at 479. Doucette also describes several types of misconduct in a general manner, making particular details, or the misconduct's frequency, impossible to determine. See, e.g., Doucette Decl. II ¶¶ 35, 37, 43. Because Doucette does not demonstrate how the other employees' misconduct compares in severity or frequency, she cannot establish disparate treatment. Gilmore, 319 F.3d at 1046.

Even when these six employees are compared to Doucette, their employment records do not indicate comparatively favorable treatment. Two of the employees were forced to resign and

a third was demoted. Doucette argues these employees received favorable treatment because Wetzel asked them to resign or demoted them instead of terminating them. This argument is not persuasive. Wetzel testified he offered the option to resign or be demoted in these instances as a way for the County to avoid potential termination challenges. Wetzel Dep. 90-92. Doucette did not ask, and does not ask now, for the option to resign instead of being terminated. Wetzel also testified, and Doucette does not dispute, that no lower positions to which Doucette could have been demoted were available at the time of Doucette's termination. See Wetzel Dep. 15, 109-10.

Doucette argues the fourth employee did not receive proper discipline for an instance in which he was disrespectful toward Doucette. However, this employee did receive a formal reprimand for failing to meet and discuss the situation. Coler Decl. Ex. 51. Doucette also claims this employee received numerous complaints from inmates regarding mistreatment, but Doucette fails to offer any corroboration for these assertions beyond the declaration she provided in opposition to the present motion. Doucette Decl. II ¶ 37. Further, Monnier testified inmates routinely complained about jail employees, including Doucette. Monnier Dep. 176. Without some further evidence of misconduct, the Court will not find disparate treatment between Doucette and the fourth employee. See Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994) (affirming summary judgment where plaintiff failed "to adduce any independent evidence to substantiate his disparate treatment claim"). The same is true for the fifth employee, who Doucette argues mishandled inmate safety. Doucette Decl. II ¶ 34. Again, Doucette provides no evidence of such misconduct beyond her own, self-serving declaration.

Doucette argues the County failed to discipline the sixth employee for failing to attend work as scheduled. But, as Monnier avers, this employee had received leave to be flexible due

to issues in his personal life.  Monnier Aff. [Docket No. 38] ¶¶ 3-4 (filed under seal).  Monnier never informed Doucette of the reason for this employee's scheduling flexibility.  Id.  In addition, Monnier stated that he also accommodated the schedules of other employees, including female employees, for health or personal issues.  Id. at ¶¶ 5-6.  Finally, as the County notes, Doucette herself was granted an extended vacation.

More than half of the County's jail division employees are female.  Monnier Dep. 161.  Doucette argues the County rarely uses formal discipline, and that her record of discipline is automatically disproportionate in comparison.  However, neither party cites any evidence indicating the County disciplined female employees disproportionately; on the contrary, the County's records indicate, apart from Doucette, it administered formal discipline eight times to male employees and seven times to female employees since 2006.  See Coler Decl. Ex. 51.  That Doucette may have received more instances of disciplinary action as compared to others does not by itself support that this treatment was the result of Doucette's gender.  Thus, Doucette has not established a prima facie case of sex discrimination.

### b.  Legitimate reason for adverse employment action

Even if Doucette had established a prima facie case of sex discrimination, the remainder of the McDonnell Douglas test warrants a finding in favor of the County.

Regarding the second phase of the test, Doucette does not actually dispute making many of the errors that gave rise to her disciplinary actions.  Instead, she argues her errors were expected, fixable, and did not affect the County's reputation.  See Pl.'s Opp. 14.  For example, in 2007, Monnier issued two verbal reprimands to Doucette for billing errors.  Doucette's explanation for these errors is that the jail was operating at full capacity at the time, and that

even Wetzel acknowledged that Doucette's workload had become unmanageable.  See Doucette

Dep. 28.  In 2010, Monnier placed Doucette on a corrective action plan, noting several billing

errors in his letter of reprimand.  Again, Doucette does not contest the occurrence of these errors,

but argues mistakes, and subsequent adjustments, were "routine and somewhat unavoidable."

Pl.'s Opp. 17.  In June 2011, Monnier suspended Doucette for three days for failing to conduct

monthly reconciliations.  Doucette does not argue she submitted the reconciliations, but notes

only that she was on vacation for a portion of that time, and that the computer system caused

delays.  Id. at 20.  Perhaps even more importantly, Doucette admits misrepresenting to Monnier

the progress she had made conducting the reconciliations.  Similarly, Doucette does not deny

failing to correctly date and address an invoice for another county; instead, she argues Monnier

caught the error "as part of his supervisory duties" and that she would have immediately

corrected it.  Id. at 21.  Based on the record, the County has stated legitimate reasons for

Doucette's disciplinary actions and termination; as a result, it has satisfied the second element of

the McDonnell Douglas test.

### c.  Evidence of pretext

Doucette has not shown how the County's stated reasons are pretextual, as she cannot

demonstrate: (1) the stated reasons for her disciplinary actions and termination were false; and

(2) discrimination was the actual reason for these adverse employment actions.  St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993).  At this stage, the question is not whether the

defendant's stated reasons are credible, but rather, whether the defendant intentionally

discriminated against the plaintiff.  Id. at 518-19.

As part of their alleged plan to discriminate against Doucette, Doucette argues Wetzel

and Monnier scrutinized her work and disproportionately reprimanded her for record-keeping errors. But Doucette's own admission of, and equivocation on, the merits of the disciplinary actions actually support the County's position. As has often been repeated, a court does not sit as a "super-personnel department" within a business or entity. Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986). Where the entity has made a non-discriminatory decision, even an unfair one, the court will not revisit or second guess the decision. See id.; see also Guimaraes v. SuperValu, Inc., 674 F.3d 962, 977 (8th Cir. 2012) (citations omitted). Here, the County documented its reasoning for each disciplinary action and for Doucette's termination, and Doucette admits at least some fault in making errors and misstating the status of her work. Absent some evidence of discrimination, the prudence of the County's decisions is irrelevant.

To establish a discriminatory motive, Doucette alleges Wetzel and Monnier fostered an "old boys' club," which favored male employees. For example, Wetzel held weekly administrator meetings for the sheriff's department, which Monnier attended for the jail division of the department, and three administrators attended for other department functions. Monnier Dep. 111-12. In addition, Monnier held "team leader" meetings for the jail side of the department. Id. at 107-111. Doucette argues her exclusion from both of these regular meetings was discriminatory and undermined her authority. She further argues some male employees socialized with Monnier in his office, further cementing their favorable treatment. The effect of the "old boys' club," Doucette argues, is demonstrated by Wetzel's choice to promote Monnier instead of her, and that another female employee, Anne Roach, was similarly passed over for promotions. See generally Roach Decl. [Docket No. 33].

Doucette's loosely-defined evidence of an "old boys' club" does not establish

discrimination. Regarding the County's meetings, Doucette does not dispute that Wetzel and Monnier were entitled to hold staff meetings including only certain levels of management. Doucette never makes clear why she, as Monnier's assistant, would be required at administrator meetings Monnier attended himself. Doucette also does not argue that previous assistant jail administrators or assistants in comparable positions attended such meetings while she was not invited. And although Doucette testified she considered herself essential to Monnier's team leader meetings, Doucette admitted she could forward items to be discussed at the team leader meetings, that meeting minutes were publicly available, and that other female employees served as team leaders. See Doucette Dep. 190-92; see also Monnier Dep. 109-11, 161-62. Monnier also testified that the team leaders themselves did not want Doucette to participate in the meetings, to which Doucette offers no response. Monnier Dep. 109-10.

Regarding promotions, Doucette again offers nothing beyond conclusory assertions. Doucette contends that she was the superior candidate for two positions she applied for in 2004. Doucette Decl. I ¶¶ 13-15. But, Doucette provides no evidence beyond her own declaration indicating why she was the objectively better-qualified candidate for each job. Nowhere in the record does Doucette establish the qualifications of those who received the positions instead of her. Similarly, neither Doucette nor Roach indicate whether Roach was objectively more qualified than the others competing for promotion. Instead, Roach focuses on a single criterion, her education as a teacher, that allegedly made her more qualified, and ignores other possible considerations.[3] Doucette also does not address the higher-level positions held by, and

---

[3] Roach also argues she was passed over for a position at the same pay scale but which she considered to be a promotion based on the position's more consistent schedule. Although Roach may have considered the position a promotion, it is not clear from the record how this

promotions of, several female employees in the department, including other supervisors and sergeants. <u>See</u> Wetzel Dep. 75-76. From a statistical viewpoint, Doucette has not established a gender bias in the County's promotion decisions.

Doucette's argument regarding the County's conspiracy to terminate her to help preserve male employees' jobs in the face of budget cuts also does not succeed. The County argues, and Doucette does not dispute, that funding saved by the sheriff's department can only be used by the department within that same fiscal year. Any future money saved by eliminating a sheriff's department position is simply folded into the County's general budget; the sheriff's department does not continue to receive the funding it saved by eliminating a position. <u>See</u> Wetzel Dep. 64. And, as Wetzel testified, the funding for Doucette's position was secure at the time of her termination. <u>Id.</u> at 63-65. Just as importantly, Wetzel testified, and again, Doucette does not dispute, that several employees in the sheriff's department had recently retired. By eliminating these positions through attrition, the County had no need to conduct layoffs. Monnier Dep. 119-121.

Viewing the record as a whole, Doucette has not shown the County's intent to discriminate against her on the basis of her gender.

### 2. Sex-Plus-Age Discrimination

In her memorandum, Doucette raises for the first time a claim of sex-plus-age discrimination. A plaintiff bringing a "sex-plus" discrimination claim alleges that her employer has discriminated against her on the basis of her sex <u>and</u> another characteristic. <u>Pullar v. Ind. Sch. Dist. No. 701, Hibbing</u>, 582 N.W.2d 273, 276-77 (Minn. Ct. App. 1998). In other words,

_____

might be evidence of discrimination.

the employer has allegedly discriminated against a sub-class within a protected class.  Id. at 277;

see also Johnston v. U.S. Bank, Nat. Ass'n, No. 08-cv-0296, 2009 WL 2900352, at *8-9 (D.

Minn. Sept. 2, 2009).  Thus, for example, an employer might discriminate against women with

children but not men with children.  Johnston, 2009 WL 2900352, at *8 (citation omitted).

While the Minnesota Supreme Court has not expressly recognized a claim for sex-plus-

age discrimination (as opposed to other sex-plus claims), it is likely the court would do so.  Both

sex and age are already independently-protected classes under the MHRA, and age is one way by

which an employer could discriminate against some members of one sex but not the other.  Cf.

King v. Trans World Airlines, Inc., 738 F.2d 255, 258-59 (8th Cir. 1984) (discussing

discrimination at intersection between sex and other characteristics, including family status).

Also, district courts within this circuit have recognized sex-plus-age claims in comparable

contexts.  See Hall v. Mo. Highway & Transp. Comm'n, 995 F. Supp. 1001, 1005 (E.D. Mo.

1998); McGrane v. Proffitt's Inc., No. C 97-221-MJM, 2000 WL 34030843, at *7 (N.D. Iowa

Dec. 26, 2000).  However, it appears no federal appellate court has yet recognized the sex-plus-

age claim.  See, e.g., Sherman v. Am. Cynamid Co., 188 F.3d 509, at *5 (6th Cir. Sept. 1, 1999)

(unpublished) (observing no circuit court had recognized sex-plus-age claim).

Assuming Minnesota courts would recognize a sex-plus-age claim, and further assuming

Doucette has properly and timely pled a sex-plus-age claim, this claim must still be denied.

Doucette argues the County discriminated against older women, while the "old boys' club"

favored older men.  Much of the analysis above applies to Doucette's claim here.  Doucette

identified, at most, six similarly-situated male employees.  Of those, five were relatively close to

Doucette's age at the time of her termination.  See Pl.'s Opp. 28-29, 40.  As discussed above,

Doucette has not demonstrated how she received disparate treatment as compared to these employees, nor has she established that the stated reasons for her discipline and termination were pretext for discrimination.

Beyond her sex discrimination evidence, Doucette offers only limited evidence specifically in support of her sex-plus-age discrimination claim. In particular, Doucette argues a younger female employee received more favorable treatment than she did. Doucette describes an instance in which she complained, based on her perception, that this younger employee had been taking extended breaks. Doucette Decl. II ¶ 42. In response, Monnier instituted fixed durations for lunch and break times, where Doucette had previously taken a longer lunch and no breaks. Id. From this incident, Doucette argues she felt as though she had been punished. However, the instituted policy applied to both employees equally and does not indicate discriminatory intent. Id. In addition, Doucette states in her declaration that Monnier did not discipline the younger employee for comparable record-keeping errors. Id. at ¶¶ 45-49. But, again, Doucette provides no evidence of these performance issues.

Doucette also cites two remarks as evidence of sex-plus-age discrimination. First, Doucette learned that while she was on extended vacation in early 2011, Monnier had asked Doucette's daughter, also a County employee, about whether Doucette intended to retire. Doucette Decl. I ¶ 25; LeBlanc Decl. [Docket No. 32] ¶¶ 1-2. Doucette was not present. Doucette's daughter responded that Doucette had no intention of retiring. LeBlanc Decl. ¶ 2. Second, Doucette testified about a meeting held by Wetzel during which, according to Doucette, Wetzel stated older people should not be in law enforcement, as they tended to get injured more

often.[4]  Doucette Dep. 217-18.  According to Doucette, she and two other, similarly-aged female employees felt as though Wetzel had directed the comment toward them.  Id. at 217; Doucette Decl. II ¶ 52.

Remarks made in the workplace that do not evidence direct discrimination may still support a case of pretextual discrimination.  See Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr., 133 F.3d 616, 621 (8th Cir. 1998).  However, a court must distinguish between comments that reflect discriminatory intent and "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) (quotations omitted).

Neither of the above-identified statements amounts to evidence of sex-plus-age discrimination.  Monnier's question about whether Doucette intended to retire does not indicate discriminatory intent.  The question itself was neutral, and Doucette makes no effort, beyond repeating it, to indicate how it demonstrates discriminatory intent.  See Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998) (holding when inquiries regarding retirement are reasonable, plaintiff "should not be able to rely on those inquiries to prove intentional discrimination") (citations omitted).  Based on an entirely different conversation between Doucette and Wetzel, Doucette then argues Wetzel attempted to make Doucette "miserable" after learning she did not intend to retire.  Pl.'s Opp. 19.  Doucette takes Wetzel's statement out of context.  Wetzel testified that if Doucette had intended to retire soon, he saw no reason to further address Doucette's ongoing performance problems.  Wetzel Dep. 58-59.  Nothing about

_____

[4]  Wetzel disputes this version of his statement, but the incident will be reviewed in the light most favorable to Doucette.  See Wetzel Dep. 71.

this evidence, taken in any light, demonstrates the County's intent to discriminate against Doucette because of both her sex and age. Similarly, Wetzel's statement at the meeting, taken in the light most favorable to Doucette, was still gender-neutral. The fact that Doucette and possibly two other female colleagues felt Wetzel had directed the statement toward them does not demonstrate discriminatory intent, nor does Doucette indicate how Wetzel's statement related to the decisional process that led to her termination.

Taking together the evidence regarding Doucette's sex discrimination claim as well as the specific evidence Doucette offers in support of her sex-plus-age discrimination claim, the Court finds Doucette has failed to establish a triable claim for sex-plus-age discrimination.

### 3. Reprisal

For her last claim, Doucette alleges the County terminated her in reprisal for her filing of an age and sex discrimination complaint. Minn. Stat. § 363A.15 prohibits employers from intentionally engaging in any reprisal against any person because he or she opposed a practice forbidden by the MHRA. As with the claims above, an MHRA reprisal claim proceeds under the McDonnell Douglas burden-shifting framework.

#### a. Prima facie case

To establish a prima facie case of reprisal, a plaintiff must establish: "(1) statutorily protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Hoover, 632 N.W.2d at 548 (quotation omitted).

Under the MHRA, statutorily protected conduct includes when a plaintiff "alleges facts supporting a good-faith, reasonable belief that the conduct opposed constituted a violation of the MHRA." Dixon v. Mount Olivet Careview Home, No. 09-1099, 2010 WL 3733936, at *7 (D.

Minn. Sept. 17, 2010) (citation omitted), <u>reconsideration denied</u>, 2010 WL 4736217.  The

plaintiff need not actually establish discrimination as a fact.  <u>See</u> <u>id.</u>; <u>see also</u> <u>McCoy v. Metro.</u>

<u>State Univ.</u>, No. A.11-225, 2011 WL 3903282, at *4 (Minn. Ct. App. Sept. 6, 2011) (holding

plaintiff not required "to prove the underlying merits" of discrimination claim, only that he had

good-faith, reasonable belief that conduct he opposed violated MHRA) (review denied Nov. 15,

2011); <u>Beyena v. Sunburst Transit, LLC</u>, No. A12-0817, 2012 WL 6554537, at *5 (Minn. Ct.

App. Dec. 17, 2012) (review denied Mar. 19, 2013).

 In this case, the County does not dispute that Doucette engaged in statutorily-protected

conduct by sending a letter to the County on August 19, 2011, in which she claimed age and sex

discrimination.  Def.'s Mem. Supp. Summ. J. [Docket No. 17] 17.  Similarly, the County does

not dispute Doucette's termination was an adverse employment action.  As a result, Doucette

satisfies the first two elements of a prima facie retaliation claim.

 The parties do, however, disagree as to whether the evidence supports a causal

connection between Doucette's complaint and her subsequent termination.  A plaintiff must

generally introduce "more than a temporal connection" between the protected activity and the

adverse employment action to establish causation.  <u>Hervey</u>, 527 F.3d at 723.  In particular,

evidence that "the employer had been concerned about a problem before the employee engaged

in the protected activity undercuts the significance of the temporal proximity."  <u>Smith</u>, 302 F.3d

at 834.

 Here, Doucette's termination occurred nearly three months after her initial complaint of

discrimination.  This span of time does not, by itself, indicate causation.  However, Doucette

attempts to qualify her case by relying on the timing of a letter to the County sent by her

attorneys on October 5, 2011. Doucette argues the timing of her actions to formalize and continue pursuing her discrimination claims supports a finding of causation.

Doucette's argument in this regard raises an issue of fact. After Doucette's initial letter alleging discrimination, Doucette hired attorneys and worked with her union representative to initiate the formal grievance process. This process continued for two months and involved meetings with Monnier, Wetzel, Gruber, and others while Doucette was still on FMLA leave. Doucette returned from leave on October 24, 2011 and it was only two weeks later that Monnier identified two errors and began the termination process.

In further support of her claim, Doucette argues the cause of her termination—a minor billing error and a copy machine mix-up—betray the County's intent to lie in wait and seize the first ostensibly-legitimate opportunity to terminate her. Doucette argues that her previous complaints were met with increased scrutiny and further reprimands, and that after she made a formal discrimination complaint, the County terminated her for "petty" errors.

Since 2007, Doucette's performance history reflects an increasingly contentious relationship between herself, on one hand, and Monnier and Wetzel on the other. It is plausible that once Doucette initiated a claim of discrimination, the County seized whatever opportunity it could to terminate her. This is borne out to some degree by the seemingly disproportionate reaction of terminating Doucette after she committed a $15 to $20 billing error and mistakenly left a small paper slip in the copy room. <u>See</u> Monnier Dep. 20-24, 31. The County did not terminate Doucette for a performance issue comparable to her past errors. While the Court will not second guess an employer's business decisions, the record as a whole could cause a reasonable factfinder to "raise an eyebrow" at the circumstances of Doucette's termination.

28

<u>MacDissi v. Valmont Indus., Inc.</u>, 856 F.2d 1054, 1058 (8th Cir. 1988). As such, Doucette has established a question on fact on her MHRA retaliation claim.

**D. Remand to State Court**

Doucette's original choice of forum was Minnesota state court, and only Doucette's state law claim for retaliation remains. As a result, this Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). See <u>D.J.M. v. Hannibal Pub. Sch. Dist. No. 60</u>, 647 F.3d 754, 767 (8th Cir. 2011). This action will be remanded to Morrison County District Court.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The County's Motion for Summary Judgment [Docket No. 15] is **GRANTED IN PART** and **DENIED IN PART**.

2. This action is **REMANDED** to Morrison County District Court pursuant to 28 U.S.C. § 1367(c).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


BY THE COURT:


s/Ann D. Montgomery
_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 29, 2013